ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, a corporation, Gray's Point Terminal Railway Company, a corporation, and Paragould Southeastern Railway Company, a corporation, Respondents,

v.

STATE TAX COMMISSION OF MISSOURI, James M. Robertson, John A. Williams, and J. Ralph Hutchison, Members of the Missouri State Tax Commission, and J. R. Towson, Secretary of Missouri State Tax Commission, Appellants.

No. 46919.

Supreme Court of Missouri,

Division No. 2.

Jan. 12, 1959.

John M. Dalton, Atty. Gen., Donal D. Guffey, Asst. Atty. Gen., for appellants.

Harold S. Cook, Samuel B. Murphy, D. Jeff. Lance, St. Louis, for respondents, Cook, Murphy & Lance, of counsel.

Harold L. Harvey, St. Louis, for Missouri Pacific R. Co., amicus curiae.

STOCKARD, Commissioner.

This is an appeal from a judgment of the Circuit Court of the City of St. Louis, which, on review pursuant to Chapter 536, RSMo 1949, V.A.M.S., known as the Administrative Procedure Act, set aside a decision of the State Tax Commission and remanded the cause to the Commission with directions to determine the assessment of respondents' rolling stock at a figure $465,213 less than that determined by the Commission.

Appellate jurisdiction is in this court because the case involves the construction of the revenue laws of this state. Art. V, Sec. 3, Constitution of Missouri, V.A.M.S.; May Department Stores Co. v. State Tax Commission, Mo.Sup., 308 S.W.2d 748.

There is no dispute as to the facts. The question presented for review is solely one of law.

The St. Louis Southwestern Railway Company, Gray's Point Terminal Railway Company, and Paragould Southeastern Railway Company are all a part of a railroad system known as St. Louis Southwestern Railway Lines or "the Cotton Belt," and which operates in the states of Missouri, Illinois, Arkansas, Tennessee, Louisiana and Texas. The Cotton Belt operates or runs its trains, that is, its rolling stock, over a total of 1,559.74 miles of railroad. Of this total, 1,316.87 miles are either owned by the Cotton Belt or operated by it under exclusive leases. The remaining 242.87 miles are used by it pursuant to so-called "trackage right" agreements. These agreements exist with eight other railroad companies. They are all different and we need not set out their terms. It is sufficient to say that they provide, in substance, for the joint use of the railroad track by the Cotton Belt and the owner of the track covered by the respective agreements. It is agreed that the Cotton Belt holds itself out to the public as a common carrier over all of the "trackage right mileage," and over that mileage it regularly, habitually and continuously operates its trains and rolling equipment as a part of its system-wide operation.

Section 151.060 (all statutory references are to RSMo 1949, V.A.M.S.) provides that the State Tax Commission shall assess, adjust and equalize the aggregate valuation of the property of each railroad company. The Commission found and determined the value of the rolling stock of the Cotton Belt, wherever located, for the year 1957 to be $20,188,537. This determination is not questioned and is not an issue in this case. In paragraph 3 of Section 151.060 it is then provided "that when any railroad shall extend beyond the limits of this state and into another state in which a tax is levied and paid on the rolling stock of such road, then the said commission shall assess, equalize and adjust only such pro-

portion of the total value of all the rolling stock of such railroad company as the number of miles of such road in this state bears to the total length of the road as owned or controlled by such company." Apparently there is no question but that all the other states in which the Cotton Belt operates levy a tax on its rolling stock. The Commission arrived at an assessed valuation of the rolling stock of the Cotton Belt subject to taxation by the state of Missouri for the year 1957 in the amount of $3,324,435. In arriving at this figure the Commission used a proportion of the total value of rolling stock determined by the ratio of the number of miles of road in Missouri over which the Cotton Belt operates and which is either owned or leased by it under exclusive lease, to the number of miles of road over which the Cotton Belt operates in all the states, including Missouri, which is either owned or leased by it under exclusive lease. The Commission did not take into consideration the 4.05 miles of road in Missouri and the 238.82 miles of road in four other states over which the Cotton Belt regularly and continuously operates its rolling stock pursuant to the so-called trackage agreements. If it had done so, as the Cotton Belt contends it should, the assessed valuation of rolling stock subject to taxation by the state of Missouri would have been $2,859,222. Whether the Commission was correct in using the formula it did, or whether the Circuit Court of the City of St. Louis was correct in directing that the Commission take into consideration the 242.87 miles of road used pursuant to the trackage agreements is the sole question for decision on this appeal.

When the rolling stock of a railroad company is at all times physically located within the territorial boundaries of a state, no particular problem is presented concerning the authority of the state to tax, but in modern railroad transportation that is the unusual case. In the ordinary case, and certainly in the situation with Cotton Belt, the rolling stock of a railroad company is constantly changing as the cars and engines pass through, into, and out of the various states. In recognition of the difficulty, if not impossibility, of one state to tax fairly on the basis of the situs of the rolling stock, the states have devised the so-called unit plan of assessment. 84 C.J.S. Taxation § 426; 51 Am.Jur., Taxation, § 905. See also the cases collected in the annotation at page 49 A.L.R. 1099. One method under this unit plan is to assess the tax on the basis of the average number of units within the state over a period of time, 49 A.L.R. at page 1104, and it has been said that this is the "fairest" basis. 51 Am.Jur., Taxation § 905. This method has been approved by the United States Supreme Court. Johnson Oil Refining Co. v. State of Oklahoma ex rel. Mitchell, 290 U.S. 158, 54 S.Ct. 152, 78 L.Ed. 238. However, Missouri does not use the "average number of units" formula, but instead uses a formula based on the ratio of number of miles of road in this state to the number of miles of road in all states. This method of assessment has also been judicially approved when the result is fair. Pullman's Palace-Car Co. v. Commonwealth of Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613. But it is clear that under particular factual situations this formula can result in unfair and unrealistic taxation, and this method was held invalid in at least one situation where the application of the formula resulted in a valuation for tax purposes far in excess of the value of the average number of units present in the state. Union Tank Line v. Wright, 249 U.S. 275, 39 S.Ct. 276, 63 L.Ed. 602; 51 Am.Jur., Taxation § 905.

We need not be concerned with the question of whether Missouri constitutionally could impose an ad valorem tax on all the rolling stock, wherever located but which has not acquired a permanent situs outside the state, of a railroad company domiciled in this state, see People of State of New York ex rel. New York Central & Hudson River Railroad Company v. Miller, 202 U.S. 584, 26 S.Ct. 714, 50 L.Ed. 1155, or whether the statement in Standard Oil Co. v. Peck, 342 U.S. 382, 72 S.Ct. 309, 310, 96 L.Ed.

427 (a case pertaining to ad valorem tax by the domiciliary state on boats and barges), that "The rule which permits taxation by two or more states on an apportionment basis precludes taxation of all of the property by the state of the domicile" is equally applicable to the taxation by the domiciliary state of the rolling stock of interstate railroads. Missouri has, whether constitutionally required to or not, limited its ad valorem tax on the rolling stock of an interstate railroad domiciled and operating in Missouri to that "proportion of the total value" as set forth in Section 151.060.

 It is provided by Section 151.060 that in applying the "ratio" formula the Tax Commission shall "adjust only such proportion of the total value of all the rolling stock of such railroad company as the number of miles of such road in this state bears to the total length of the road as owned or controlled by such company," and it is "elementary that the primary rule to be applied in the construction of statutes is to ascertain and give effect to the legislative intent." Taney County v. Empire District Electric Company, Mo.Sup., 309 S.W.2d 610, 614; State ex rel. Union Electric Light & Power Co. v. Baker, 316 Mo. 853, 293 S.W. 399. Therefore the decisive question is to determine what the Legislature intended to include by the term "road as owned or controlled," and in determining this question we must give the words their plain or ordinary meaning, Section 1.090, with a view to promoting the apparent objective of the Legislature by their use. When Section 151.060 is so construed, we conclude that the State Tax Commission was in error in failing and refusing to take into consideration the 242.87 miles of road used pursuant to the trackage agreements under the circumstances of this case. We reach this conclusion because for the reasons subsequently set forth we think it was the intent of the Legislature that it be done; the usual and ordinary sense of the words requires it; and the exclusion of such "trackage mileage" under some factual situations would lead to results that obviously could not have been intended.

 The theory of the method provided for in Section 151.060 for determining the proportion of the total value of the rolling stock for tax purposes is that the rolling stock is substantially evenly divided throughout the railroad's entire system, and the percentage of all units which are located in Missouri at any given time, or for any given period of time, will be substantially the same as the percentage of all the miles of road of the railroad located in Missouri. But, what miles of road? The statute says the miles of road which are "owned or controlled." The Tax Commission reads this to be "owned or [exclusively] controlled." Under the facts of this case the "trackage agreement mileage" is just as much a part of the Cotton Belt's railroad system as are the owned and leased lines. While it does not have exclusive control of the road covered by the agreements, it unquestionably has sufficient control of the road to operate thereon its rolling stock, and at any given time its rolling stock is distributed over the "trackage agreement mileage" the same as over the rest of its system. For example, in 1956 the ton-miles of freight handled by the Cotton Belt over approximately 238 miles of road covered by trackage agreements was slightly less than two billion, but the total ton-mileage of freight handled during the same period over all the owned branch lines in Missouri totaling 191.74 miles was only slightly more than fifty million, or in the neighborhood of one-fortieth as much. When we take into consideration the purpose of Section 151.060, the theory under which it is supposed to operate, and the obvious objective to be accomplished, it is inescapable that the Legislature meant and intended that the "proportion of the total value of all the rolling stock" should be determined from the miles of road which a railroad owns or over which it has sufficient control, even though not exclusive, to operate there-

on its rolling stock on a regular and continuous basis as a part of its interstate system.

No case is cited to us, and our research has discovered none, which has considered the precise question presented in this case. However, three cases are somewhat helpful by way of analogy. Louisville & N. R. Co. v. Commonwealth, 181 Ky. 193, 204 S. W. 94, 95, pertained to the formula established in Kentucky for apportioning the value of the franchise of an interstate railroad upon which Kentucky was entitled to collect taxes. The statute, Ky.St.1915, § 4079 required that the assessing authority consider the "length of entire lines operated, owned, leased or controlled" in Kentucky and elsewhere. One of the questions on appeal pertained to whether certain lines should be reported as leased, and the court commented as follows: "It is also insisted by counsel for commonwealth that the lines of the Georgia railroad and dependencies should not be reported as a leased road, nor considered as such by the board of valuation and assessment, because the testimony shows that that road, while leased and operated by the defendant, is also used by another lessee operating its trains over it. But we are unable to see wherein the defendant is any the less a lessee of that road because, forsooth, another, also a lessee, operates its trains over it." In Commonwealth v. Louisville & Nashville Railroad Company, 149 Ky. 829, 150 S.W. 37, 40, the same statute was under consideration, and it was there held that "if a railroad company owns a majority of the stock of another company, so that it may elect its directors and dictate its policy, there can be no doubt that it controls it within the meaning of the statute, * * *." This was cited with approval in Louisville & Nashville Railroad Company v. Greene, 244 U.S. 522, 543, 37 S.Ct. 683, 61 L.Ed. 1291, Ann.Cas.1917E., 97. In Hughes v. Houston, E. & W. T. R. Co., 157 La. 8, 101 So. 728, 729, the Louisiana statute, Act. No. 170 of 1898, § 29, LSA–R.S. 47:1984 provided that the rolling stock of an interstate railroad should be "in the ratio which the number of miles of the line within the state has to the total number of miles of the entire lines." The railroad owned no miles of track in Louisiana, but operated its trains over the track of another railroad pursuant to "a contract made for the mutual advantage of the two corporations." It was held that the word "line" did not mean "roadbed," but that it constituted the route over which the railroad company carried on its business. The miles of road or line in Louisiana over which the railroad operated its trains was used to determine the proportionate value, for assessment purposes, of the company's rolling stock.

We do not take the position that these three cases determine the question before us, but they do demonstrate that the courts have taken the position that so-called "yard sticks" established to determine the share of the total value of a franchise or of rolling stock for tax purposes are to be construed to carry out the objective the Legislature intended to accomplish.

The position of the Tax Commission under the facts of this particular case does not lead to a result so unreasonable that it thereby demonstrates it is contrary to the intention of the Legislature, but the statute must apply to all situations. We need but refer to two assumed factual situations, neither of which is unreasonable nor improbable, to show that the Legislature could not possibly have intended the results necessarily reached by the interpretation of Section 151.060 by the Tax Commission when applied to the assumed facts. The record shows that the Cotton Belt owns no road and has no road under exclusive lease in the state of Illinois, but it does use and regularly operate its trains over a total of 123.93 miles of track in that state pursuant to so-called trackage agreements. If we assume that the total operations of the Cotton Belt consisted only of the existing road in Missouri and Illinois, then according to the view of the Tax Commission the proportionate share of the rolling stock subject to tax by Missouri would be 100%,

a result obviously not intended, and a result which would cast considerable doubt on the validity of the statute as applied to those facts. See Standard Oil Co. v. Peck, supra. Next, if we assume that all of the operations of the Cotton Belt in Missouri were conducted over track covered by trackage agreements, as they now are in Illinois, then under the position of the Tax Commission, Missouri would not be entitled to tax any proportion whatever of the value of the rolling stock of the railroad company even though it would regularly and continuously operate its trains and rolling stock over a total of 220.9 miles of track in this state.

The Tax Commission also contends that its interpretation of Section 151.060 is supported by the language of Section 151.020 which provides that every railroad company shall report to the Tax Commission each year "the total length of their road so far as completed, including branch or leased roads." It is contended that the purpose of this section is to provide the Tax Commission with a list of property subject to taxation, and also to provide the Commission with the necessary information to effect a compliance with Section 151.060. The argument then follows that "their road" means "owned road" because, if not, it would have been unnecessary to add "including * * * leased roads." There is some merit to this contention, but if this be correct, then, strictly speaking, there was no purpose in adding the words "including branch * * * roads," because they would have been either owned or leased. When statutes are so inartfully and loosely drawn as the ones under consideration, the strict meaning and arrangement of the individual words used are not as persuasive for purposes of statutory construction as a reasonable meaning of the words which is in accord with the legislative intent and objective. The "trackage right" agreements come close to constituting leases within the technical legal meaning of that term, but strictly speaking they are probably licenses. See 51 C.J.S. Landlord and Tenant § 202 e (2). But we seriously doubt if the Legislature had any intention whatever in making this technical distinction which is "often difficult to determine." 51 C.J.S., supra. In any event, we are of the opinion that railroad track which is habitually, constantly and regularly used by railroad companies as an essential part of their entire system is part of "their road" within the meaning of the statutes under consideration.

The construction of Section 151.060 by the circuit court is unquestionably in accord with the intent of the Legislature, it is justified by and consistent with the language used, and it does not have the potential possibility in its application to other factual situations of bringing about the unreasonable results previously mentioned.

The judgment is affirmed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.